**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT ZITO, Derivatively on Behalf of Nominal Defendant ROBINHOOD MARKETS, INC.,<br><br>          Plaintiff,<br>     v.<br><br>VLADIMIR TENEV, BAIJU BHATT, JAN HAMMER, PAULA LOOP, JONATHAN RUBENSTEIN, SCOTT SANDELL, AND ROBERT ZOELLICK,<br><br>          Defendants,<br><br>          And,<br><br>ROBINHOOD MARKETS, INC.,<br><br>          Nominal Defendant. | Case No.:<br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Robert Zito ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Robinhood Markets, Inc. ("Robinhood" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of federal law. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Robinhood with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers in their management and control of the Company.

## JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Jurisdiction is also conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper in this Court because the Company is incorporated in Delaware.

## PARTIES

**Plaintiff**

4.      Plaintiff purchased shares of Robinhood stock during the time period in issue and continues to hold his Robinhood Markets stock currently.  Plaintiff is a citizen of Wisconsin.

**Nominal Defendant**

5.      Nominal Defendant Robinhood is a Menlo Park, California-based company that provides a vehicle through which people can buy and sell stocks, ETFs and cryptocurrencies. Incorporated under the laws of the state of Delaware, Robinhood maintains its principle executive offices at 85 Willow Road, Menlo Park, California 94025.  Nominal Defendant is a citizen of California and Delaware.

**Director Defendants**

6.      ***Defendant Vladimir Tenev*** ("Tenev") is, and was at all relevant times, Co-Founder, Chief Executive Officer ("CEO"), and President of Robinhood, as well as a director on

the Company's Board of Directors (the "Board"). Defendant Tenev reviewed, approved, and participated in making statements in the Offering Documents, which he signed.   Defendant Tenev is a defendant in the securities class action entitled *Golubowski v. Robinhood Markets, Inc., et al.*, Case 3:21-cv-09767-EMC (N.D. Cal.) (the "Securities Class Action").   Defendant Tenev is a citizen of California.

7.     ***Defendant Baiju Bhatt*** ("Bhatt") is, and was at all relevant times, Co-Founder and Chief Creative Officer of Robinhood, as well as a director on the Board. Defendant Bhatt reviewed, approved, and participated in making statements in the Offering Documents, which he signed.   Defendant Bhatt is a defendant in the Securities Class Action.   Defendant Bhatt is a citizen of California.

8.     ***Defendant Paula Loop*** ("Loop") is, and was at all relevant times, a director on the Board. Defendant Loop reviewed, approved, and participated in making statements in the Offering Documents, which she signed.   Defendant Loop is the Chair of the Audit Committee. Defendant Loop is a defendant in the Securities Class Action.   Defendant Loop is a citizen of Connecticut.

9.     ***Defendant Jonathan Rubinstein*** ("Rubinstein") is, and was at all relevant times, a director on the Board. Defendant Rubinstein reviewed, approved, and participated in making statements in the Offering Documents, which he signed.   Defendant Rubinstein is a member of the People and Compensation Committee.   Defendant Rubenstein is also the Chair of the Nominating and Corporate Governance Committee.   Defendant Rubinstein is a defendant in the Securities Class Action.   Defendant Rubinstein is a citizen of Florida.

10.     ***Defendant Scott Sandell*** ("Sandell") is, and was at all relevant times, a director of the Board.   Defendant Sandell reviewed, approved, and participated in making statements in the

Offering Documents, which he signed.  Defendant Sandell is the Chair of the People and Compensation Committee. Defendant Sandell is also a member of the Nominating and Corporate Governance Committee. Defendant Sandell is a defendant in the Securities Class Action. Defendant Sandell is a citizen of California.

11.     **Defendant Robert Zoellick** ("Zoellick") is, and was at all relevant times, a director on the Board. Defendant Zoellick reviewed, approved, and participated in making statements in the Offering Documents, which he signed.  Defendant Zoellick is a member of the Audit Committee.  Defendant Zoellick is a defendant in the Securities Class Action.  Defendant Zoellick is a citizen of Washington, D.C.

12.     Defendants Tenev, Bhatt, Loop, Rubenstein, Sandell, and Zoellick are collectively referred to herein as the "Defendants".

**Non-Parties**

13.     **Non-Party Frances Frei** ("Non-Party Frei") is a member of the Board. On November 15, 2021, the Board appointed Non-Party Frei to the Board, effective as of November 15, 2021. The Board also appointed her to serve on the Audit Committee and the People and Compensation Committee, commencing concurrently with her Board service.  Non-Party Frei is a member of the People and Compensation Committee.

14.     **Non-Party Dara Treseder** ("Non-Party Treseder") is a member of the Board. On October 19, 2021, the Board appointed Non-Party Treseder to the Board, effective as of November 1, 2021.  The Board also appointed her to serve on the People and Compensation Committee and the Nominating and Corporate Governance Committee, commencing concurrently with her Board service.

## FALSE AND MISLEADING STATEMENTS

15.     On July 1, 2021, Defendants caused the Company to file a draft registration statement on Form S-1, which would be used for the Company's Initial Public Offering ("IPO") following a series of amendments in response to SEC comments.

16.     On July 25, 2021, Defendants caused the Company to file its final amendment to the registration statement ("Registration Statement"), which registered 60.5 million Robinhood shares for public sale.  The SEC declared the Registration Statement effective on July 28, 2021.

17.     On July 30, 2021, the IPO was priced at $38 per share and Defendants filed the final Prospectus for the IPO, which formed part of the Registration Statement (the "Offering Documents").

18.     According to the Offering Documents, the Company's significant growth, technology, and commitment to providing users a highly accessible and safe trading experience is what "sets [it] apart," from others in the financial services ecosystem.

19.     The Company defines itself as a "safety-first company" with a "radical customer focus."   The Company states that it is committed to: (1) "quality execution," supposedly "performing regular and rigorous reviews of the execution quality [] customers receive;" (2) maintaining "high security standards" to keep customers' accounts and data safe; and (3) providing "dedicated support," to customers to resolve their issues quickly.  The Company also states that it has "made, and continue[s] to make, significant investments designed to enhance the reliability and scalability of [its] platform and operations as well as [its] customer support functions."

20.     Regarding the Company's growth, the Offering Documents highlight the increase observed in the Company's transaction-based revenue in the lead up to the IPO.  According to

the Offering Documents, the Company earned over $720 million in transaction-based revenue by year end 2020, which was four (4) times greater than what it achieved the prior year and reported over $420 million in transaction-based revenue in the first quarter of 2021 alone, setting up 2021 to be a record year.

21.     The Offering Documents also highlighted the growth observed in certain key performance indicators, to support the notion that the Company's financial health was strong at the time of the IPO (and would remain strong well into the future).  Among other things, the Offering Documents highlighted the Company's "Net Cumulative Funded Accounts," which were 12.5 million and 18 million for FY 2020 and 1Q 2021, respectively, "Monthly Active Users" (MAU), which were 11.7 million and 17.7 million for FY 2020 and 1Q 2021, respectively, and Average Revenues Per User (ARPU), which equaled $108.90 and $137.00 for FY20 and 1Q21, respectively.  The Offering Documents also highlighted the Company's "Assets Under Custody" (AUC), which equaled nearly $63 billion and over $80 billion for FY 2020 and 1Q 2021, respectively, noting in particular how cryptocurrencies comprised a significant portion of the Company's AUCs in the lead up to the IPO, rising from over $414 million in FY 2019, to over $3.5 billion by year end 2020, and a remarkable $11.6 billion in the first quarter of 2021 alone.

22.     However, the Offering Documents were false and misleading and omitted to state that, at the time of the Offering, the Company's revenue growth was, indeed, experiencing a ***major reversal***, with transaction-based revenues from cryptocurrency trading serving only as a short term, transitory injection, effectively masking what was stagnating growth.  In addition, that the Company's "significant investments designed to enhance the reliability and scalability of [its] platform" were patently inadequate and/or defective, which exposed the platform to

worsening service-level disruptions and security breaches, particularly as the Company scaled its services to a larger user base.

23.     Defendants were required to disclose this material information in the Offering Documents for at least three (3) reasons.  *First*, SEC Regulation S-K, 17 C.F.R. § 229.303 (Item 303), required disclosure of any known events or uncertainties that at the time of the Offering had caused, or were reasonably likely to cause, the Company's disclosed financial information not to be indicative of future operating results.  At the time of the Offering, the Company possessed information showing that its revenue growth was experiencing a major reversal, with transaction based revenues from cryptocurrency transactions serving as a one-time, transitory injection, effectively masking what was in fact another quarter of lackluster growth, and, further, that the investments made to enhance the reliability and scalability of the platform, particularly as the platform continued to grow, were patently insufficient, exposing the Company to service-level technical issues and data security breaches that disrupted users' ability to access their accounts and/or retain control over their personal information, which, as a result, negatively impacted the Company's ability to generate revenue.  These undisclosed adverse events and trends were likely to (and in fact, did) materially and adversely affect the Company's financial state and rendered the disclosed results and trends in the Offering Documents misleading and not indicative of the Company's future operating results.

24.     *Second*, SEC Regulation S-K, 17 C.F.R. § 229.105 (Item 105), required, in the "Risk Factor" section of the Offering Documents, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk.  The Company's discussion of risk factors did not adequately describe the risk posed by the Company's deficient efforts to enhance the reliability and scalability of its platform, which, in

turn, impacted customers' ability to access their accounts, execute transactions, and control their personal information, and the negative impact such was already having (or would have) on the Company's business, nor the other already occurring negative results and trends, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

25.     *Third*, Defendants' failure to disclose the aforementioned material information rendered false and misleading the Offering Documents' many references to known risks that, "if" occurring "might" or "could" affect the Company.  As the Company eventually revealed, these "risks" had already materialized at the time of the Offering.

26.     On October 26, 2021, after the markets closed, the Company reported its third quarter 2021 financial results, revealing that its total net revenue for the period between July 1, 2021 through September 30, 2021 — the same period during which the Company conducted its IPO — came in at $365 million, badly missing analyst estimates ***by nearly $73 million***, and declines in its monthly active users ("MAUs"), funded accounts, assets under custody ("AUC"), and average revenue per user ("ARPU").  The Company also disclosed that third-quarter transaction-based revenue from cryptocurrency trading, which in the lead up to the IPO had been the bulk of the Company's revenues, was only $51 million, significantly below the $233 million the Company earned from crypto trading in the second quarter.  The proportion of Robinhood's cryptocurrency transaction-based revenue generated by Dogecoin alone fell 40% in Q3, with the Company only generating $20.4 million in Q3 compared to ~$144.5 million in Q2.  At the same time, the Company's net losses increased from $11 million to $1.32 billion due to a $1.24 billion stock-based compensation expense that was tied to the stock's post-IPO performance, and its initial rally – which increased its shares to an all-time high of $85 a share on August 4, 2021 and

triggered *a massive payout to Defendants Tenev and Bhatt*. To make matters worse, the Company also guided for "less than $1.8 billion" in revenue for the full year, implying a maximum 85% growth, which fell well short of analyst expectations of 111%.

27.     J.P. Morgan downgraded their price target and characterized the Company's trading revenue as a  "disappoint[ment]," noting in particular how "equity trading was particularly weak, down both sequentially and YoY despite a near doubling of accounts and MTUs" and how "[c]rypto trading revenue fell 78%, down more than the crypto industry average of ~40% and the decline of Dogecoin trading of ~75%[,]" before concluding "we believe Robinhood has been overearning and guidance will weaken for '22."  J.P. Morgan also questioned why management "did not disclose trading volumes," finding it "peculiar for a company generating ~75% of revenue on volumes," but, nonetheless, suspecting "revenue per trade had been elevated [indicating] a weaker business outlook."

28.     On this news, the Company's stock dropped 10.5%, falling from $39.57 per share on October 26, 2021 to close at $35.44 per share on October 27, 2021.

## THE COMPANY'S DATA BREACH

### Robinhood Violates Its Promise and Its Duty to Safeguard Customer Data and Assets

29.     When customers open investment accounts with Robinhood, they authorize Robinhood access to one or more bank accounts and transfer funds directly into a Robinhood investment account of which Robinhood is the custodian.

30.     Customers additionally grant Robinhood access to sensitive personal and financial information, including but not limited to, their names, social security numbers, dates of birth, mailing addresses, telephone numbers, bank account numbers, details of their income, bank account balances, financial transaction histories, credit histories, tax information, and credit

scores.

31.     Customers also permit Robinhood access to information regarding their whereabouts through the devices they use to access the Robinhood platform, including but not limited to, cell phone and mobile computing device location data, IP addresses, and Wi-Fi network data.

32.     Robinhood's United States Privacy Policy claims: "we take privacy and security seriously," and the Company advertises itself as highly diligent in safeguarding its customers' accounts.  In fact, the Company guarantees full reimbursement for losses caused by unauthorized account activity.  According to claims on the Company's website:

> We're committed to keeping your account safe, so we offer robust security tools and a promise to fully reimburse direct losses that happen due to unauthorized activity that is not your fault.



33.     This is one of the "6 Commitments" Robinhood lists on its website, claiming, "these are the commitments you can always expect from us."

34.     Robinhood does not keep its promise to maintain the highest security standards. Its system lacks simple and almost universal security measures used by other broker-dealer

online systems, such as verifying changes in bank account links. Such systems prevent unauthorized users from transferring customer funds from an account without substantial verification.

35.    In July 2019, Robinhood admitted to customers it had been storing their user credentials in what is known as "cleartext," an unencrypted form readable to anyone with access to the data.  Storing this sensitive information in an encrypted form has been the industry standard for broker dealers for more than ten years.

36.    Robinhood's failure to use these and other industry-standard security measures needlessly exposed customers to the risk of data and identity theft and is the result of Robinhood's growth before-security model.

**Unauthorized Users Hacked and Looted Robinhood Customer Accounts**

37.    From on or before July 22, 2020, Robinhood negligently and illegally allowed unauthorized third-party access to approximately 2,000 customers' personal and financial information, access to the funds customers had deposited into their Robinhood accounts, and control over position in securities that customers purchased through Robinhood. These unauthorized users viewed, used, manipulated, exfiltrated, and stole this personal and financial information and took control over customers' accounts so as to rob them of money and valuable securities and harm their privacy. As a consequence of this negligent and illegal conduct, Robinhood's customers collectively lost millions of dollars.

38.    Unauthorized user access has been an ongoing dilemma for Robinhood users since the 2020 breaches and, due to Robinhood's substandard security and response practices, will continue into the future. Cyber security analysts estimate that the account security of more than 10,000 Robinhood users was likely compromised, which is approximately five times the rate of

other brokerage services.

39.     Robinhood has repeatedly neglected to fully inform customers regarding the nature and scope of data security failures and unauthorized activity.  For example, after it was revealed in 2019 that Robinhood stored customer login credentials in cleartext, the company refused to reveal how many customers' credentials were involved, how long their credentials had been maintained in that format, and who had access to the unencrypted data.

40.     Further, the widespread security breach of 2020 was only disclosed by Robinhood after reports were leaked by anonymous sources to news outlets.

41.     On October 16, 2020, after the breaches had been widely reported, Robinhood sent push notifications to customers encouraging them to enable two-factor authentication, which is a security setting requiring the use of a password combined with a temporary passcode sent to a second device to log on.

42.     Notably, many of those who were affected by the data breach already had two-factor identification enabled when the unauthorized access occurred.  Even this communication by Robinhood failed to clearly notify the affected customers about the breach, claiming the reason for the notification was simply "part of National Cybersecurity Awareness Month."

43.     Robinhood has never publicly disclosed the total number of customers whose accounts were breached or what information has been released to unauthorized users.  In its public statements, Robinhood has refused to accept fault for its security failures.  After the October 2020 breach, a Robinhood spokesperson insisted that any customer losses were caused by identity theft originating outside the Robinhood system, maintaining, "[t]his was not stemming from a breach of Robinhood's systems."

44.     When customers realized their accounts had been breached, many immediately

attempted to contact Robinhood to determine the source of the breach or request recovery of their funds. They found Robinhood was not designed to receive their communications. There was no phone number to contact a Robinhood representative listed in any materials Robinhood provided or made available to its customers. Instead, customers were directed to email Robinhood with the caveat that a response could take up to three business days. In many cases, customers waited weeks for a response.

45.     When Robinhood finally responded to customer emails, they received boilerplate responses claiming:

> We always respond to customers reporting fraudulent or suspicious activity and work as quickly as possible to complete investigations. The security of Robinhood customer accounts is a top priority and something we take very seriously.

While customers waited for Robinhood to respond, the unauthorized users to whom Robinhood allowed access continued to loot their accounts.

46.     Contrary to Robinhood's "commitment" to cover losses caused by unauthorized use, Robinhood has failed to compensate millions of dollars of losses claimed by those affected by the breach. Without explanation, Robinhood emailed customers who lost thousands of dollars in the breach informing them they would not be compensated for their losses.

47.     Then, on November 8, 2021, after the markets closed, the Company disclosed that it had suffered another "data security incident" on November 3, 2021, admitting that an "unauthorized third party" had obtained email addresses for approximately *five million users* and the full names of a different group of about two million users, indicating that the attack potentially affected nearly 40% of the Company's MAUs.

48.     Robinhood stated that the additional personal information of 310 other users, including their names, dates of birth, and zip codes, were exposed, and within that group, that 10

users suffered even "more extensive" breaches.

49.    On this news, the Company's stock dropped over 3% on November 9, 2021 to close at $36.70 per share, before then falling another 6% to close at $34.49 the very next day.

**THE COURT GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS IN THE ACTION ENTITLED *MEHTA, ET AL., V. ROBINHOOD FINANCE, LLC, ET AL.*, CASE NO. 21-CV-01013-SVK (ND. CAL.)**

50.    On May 6, 2021, Magistrate Judge Susan Van Keulen in the action *entitled Mehta, et al., v. Robinhood Finance, LLC, et al.*, Case No. 21-cv-01013-SVK (N.D. Cal.) held:

> The Court finds that Plaintiffs' factual allegations are sufficient to support their claims at the pleading stage.  Plaintiffs allege that Robinhood "does not keep its promise to maintain the highest security standards" and "[i]ts system lacks simple and almost universal security measures" that could "prevent unauthorized users from transferring customer funds from an account without substantial verification." [].  Plaintiffs allege that as a result, Robinhood "negligently and illegally allowed unauthorized third-party access to approximately 2,000 customers' personal and financial information."  [].  Thus, at this stage of the proceedings, Plaintiffs' allegations that unauthorized third parties were able to access approximately 2,000 Robinhood customers' accounts and deplete their funds due to Robinhood's security measures are sufficient.  [].  Accordingly, the Court finds that Plaintiffs have adequately alleged that a breach occurred.

*See* Order (D.E. 33) at 9.

**DUTIES OF THE DIRECTOR DEFENDANTS**

51.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

52.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

53.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)       remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)       ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)       ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

54.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

55.    The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

56.    Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## THE AUDIT COMMITTEE CHARTER

57.     The Audit Committee Charter (the "Charter") defines the duties and responsibilities of the Audit Committee:

> The Committee shall assist the Board in fulfilling ***its fiduciary responsibilities, in particular through the Committee's oversight of***:
>
> - the qualifications, independence, and performance of the independent registered public accounting firm (also referred to in this Charter as the "independent auditor");
>
> - ***the performance of the Internal Audit function***;
>
> - ***the integrity of the Company's financial statements and its accounting and Financial reporting processes***;
>
> - ***the effectiveness of the Company's internal control over financial reporting***;
>
> - the Company's processes and procedures relating to assessment and management of financial, disclosure and reporting risks; and
>
> - related person transactions.
>
> The function of the Committee is oversight. The management of the Company is responsible for the preparation and integrity of the Company's financial statements and day-to-day compliance with applicable laws, regulations, and Company policies.  Management is also responsible for implementing and maintaining appropriate accounting and financial reporting policies, procedures, and internal controls designed to support and promote compliance with applicable accounting standards and laws and regulations. The independent auditor is responsible for auditing and reviewing the Company's financial statements and, to the extent applicable to the Company, auditing the Company's internal control over financial reporting, in accordance with professional standards. The members of the Committee are not full-time employees of the Company, and in fulfilling their duties under this Charter, they do not perform or represent that they perform the functions of management or the independent.

*     *     *

**Duties and Responsibilities**

The Committee shall, in addition to any other duties or responsibilities the Board may from time to time delegate to the Committee, have the following duties and responsibilities:

**Oversight of Independent Auditor Activities**

(a)     Exercise its authority over the appointment, compensation, retention, oversight, and replacement of the independent auditor engaged for the purpose of preparing and issuing audit reports and performing other audit, review, or attest services for the Company (including resolution of any disagreements between management and the independent auditor regarding financial reporting). The independent auditor shall report directly to the Committee;

(b)     Approve, in advance (or, where permitted under the rules and regulations of the SEC, subsequently), all auditing services and permitted non-audit services to be performed by the independent auditor, and approve the scope, procedures and fees for the proposed audit for the current year;

(c)     Oversee the Company's practices with respect to hiring employees or former employees of the Company's independent auditor who were engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company;

(d)     At least annually, obtain and review a report by the independent auditor, describing (i) the independent auditor's internal quality-control procedures; and (ii) any material issues raised by the most recent internal quality-control review, peer review, or Public Company Accounting Oversight Board ("PCAOB") review of the independent auditor or by any inquiry or investigation by governmental or professional authorities, including, but not limited to, the PCAOB, regarding any independent audits carried out by the independent auditor within the last five years, and any steps taken by the independent auditor to address any issues raised. The Committee shall require as part of the independent auditor's engagement letter that the independent auditor inform the Committee and the Company immediately if it becomes aware that the independent auditor's audit of the Company is being reviewed as part of the PCAOB's inspection of the independent auditor;

(e)     Annually assess the independence of the independent auditor by (1) reviewing the written report from the independent auditor describing all relationships between the independent auditor and the Company and affirming the independence of the independent auditor as required by the PCAOB; (2) discussing with the independent auditor its independence and any disclosed relationships or services (including permitted non-audit services) that may impact its objectivity and independence; (3) otherwise

reviewing and discussing with the independent auditor all matters required to be discussed pursuant to the PCAOB's Rule 3526 (Communication with Audit Committees Concerning Independence); and (4) reporting its conclusions to the Board;

(f)     Require the lead and concurring partners of the Company's independent auditor to comply with the rotation requirements of the SEC or the PCAOB or any other applicable legislation;

(g)     Review reports of any financial or internal control-related audit performed by the independent auditor, including (1) any critical audit matters, or CAMs, that may be identified by the independent auditor in connection with its audit of the Company's annual financial statements for the current audit period and (2) any other significant matters that arose or difficulties encountered by the independent auditor;

(h)     Review reports from the independent auditor and, where applicable, the Company's management, including Internal Audit, concerning (1) critical accounting policies and practices used; (2) alternative treatments of financial information within generally accepted accounting principles that have been discussed with the management of the Company, the ramifications of the use of such alternative disclosures or treatments, and the treatment preferred by the independent auditor; (3) any other matters required to be reported to the Committee by the independent auditor pursuant to applicable auditing standards; and (4) other material written communications between the independent auditor and the management of the Company, such as any management letter or schedule of unadjusted differences;

**Oversight of Internal Audit function**

(i)     At least annually, review the organization, charter, responsibilities, plans, and resources of the Internal Audit function;

(j)     Review and approve, as appropriate, the annual audit plan and all major changes to the plan and receive periodic reports summarizing results of the internal audit projects, including any material findings;

***(k)***     ***Periodically meet separately with the Head of Internal Audit to discuss any material issues encountered in the course of the work of the Internal Audit team***;

(l)     Review the effectiveness of the Internal Audit function on a periodic basis;

(m)     Review the Internal Audit group's work and results with regard to the

Company's internal control over financial reporting and the scope of the audits planned to be performed by Internal Audit and by the independent auditor in that regard;

(n)     Approve the appointment or dismissal of the Head of Internal Audit;

**Oversight of Financial Reporting, Internal Controls, and Disclosure Controls**

*(o)     Review with management and the independent auditor the annual Audited financial statements and quarterly financial statements, and related financial information in earnings releases and SEC filings; such review shall include*:

- *the Company's Quarterly Reports on Form 10-Q and Annual Report on Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to their filing with the SEC*; and

- *any related GAAP and non-GAAP annual and quarterly financial information that is included in earnings press releases, including pro-forma or adjusted non-GAAP information, and other related financial information or earnings guidance contained therein and/or that is regularly provided to analysts and ratings agencies*;

(p)     Review with management and the independent auditor the quality and adequacy of the Company's internal control over financial reporting, including (1) management's report on the effectiveness of the Company's internal control over financial reporting; (2) if applicable to the Company, the independent auditor's report on its audit of the effectiveness of the Company's internal control over financial reporting; and (3) the Company's disclosure controls and procedures, including their effectiveness;

(q)     Review with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the Company's processes and procedures relating to assessment and management of financial, disclosure and reporting risks;

(r)     Review and approve the Company's decision to enter into swaps and other derivatives transactions that are exempt from exchange-execution and clearing under "end-user exception" regulations established by the Commodity Futures Trading Commission; and review and approve the Company's policies governing the Company's use of swaps and other derivatives transactions subject to the end-user exception;

**Committee Reports and Recommendations**

(s)    Make recommendations to the Board regarding inclusion of the Company's audited financial statements in its annual reports on Form 10-K;

(t)    Approve annually for inclusion in the annual proxy statement a report by the Committee on matters required under the SEC rules in effect from time to time;

(u)    Review any alleged violations of the Company's Code of Ethics for Senior Financial Officers ("Code of Ethics") with respect to certain financial reporting, controls and allegations of financial misconduct, and recommend any proposed changes to the Board;

(v)    Review its performance and this Charter annually and recommend any proposed Charter changes to the Board;

**Other Audit Committee Duties**

(w)    Meet with the independent auditor or head of internal audit as may be necessary to discuss or review any and all other appropriate matters within the scope of their responsibilities;

(x)    Approve Company procedures for, including the Company's Whistleblower and Non-Retaliation Policy as it relates to, the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, and regularly review any reports of such nature; and

(y)    Approve Company procedures requiring that certain "transactions" directly or indirectly involving the Company and "related persons" be brought to the Committee's attention, and review and approve, ratify, or reject those transactions in its sole discretion. For purposes of this duty, the terms "transaction" and "related person" shall have the meanings contained in Item 404 of Regulation S-K of the rules of the SEC.

(Emphasis added).

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

59.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

60.     During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Tenev, Bhatt, Loop, Rubenstein, Sandell, and Zoellick and Non-Parties Frei and Treseder.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

61.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

62.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

63.     Each of the Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

64.     Each of the Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

65.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Tenev**

66.     Because of his CEO and President position with the Company, Defendant Tenev is not independent.

67.     Defendant Tenev was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

68.     Defendant Tenev is not independent from Non-Party Frei and Treseder, and Defendants Rubinstein and Sandell, because they comprise the People and Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Tenev).  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Tenev could not consider a demand adverse to the members of the People and Compensation Committee as they are responsible for his financial future.

69.     Defendant Tenev is also a Defendant in the securities class action entitled *Golubowski v. Robinhood Markets, Inc., et al.*, Case 3:21-cv-09767-EMC (N.D. Cal.) (the "Securities Class Action") and faces a substantial likelihood of liability; therefore, demand on Defendant Tenev is futile.

**Defendants Loop and Zoellick**

70.     Defendants Loop and Zoellick served as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management, including the prevention of data breaches, and legal and regulatory compliance that may affect the Company's financial reporting.  Defendants failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC. Thus, Defendants Loop and Zoellick breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendants Tenev, Bhatt, Loop, Rubenstein, Sandell and Zoellick**

71.     Defendants Tenev, Bhatt, Loop, Rubenstein, Sandell and Zoellick breached their fiduciary duties of loyalty by allowing improper statements concerning the Company' revenue growth and security breaches.

72.     Defendants Tenev, Bhatt, Loop, Rubenstein, Sandell and Zoellick all possessed material, nonpublic company information, as detailed above.  Accordingly, defendants Tenev, Bhatt, Loop, Rubenstein, Sandell and Zoellick faces a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon defendants Tenev, Bhatt, Loop, Rubenstein, Sandell and Zoellick is futile.

## COUNT I

### (Against Defendants For Breach Of Fiduciary Duty)

73.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.    Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

75.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

76.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

77.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

78.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and

goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuit, costs associated with the multiple data breaches, and severe damage to the share price of the Company's stock, all resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against Defendants For Waste Of Corporate Assets)

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

81.     As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions and the multiple data breaches occurring under their watch.

82.     As a result of the waste of corporate assets, Defendants are liable to the Company.

83.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### (Against Defendants For Unjust Enrichment)

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and the detriment of, Robinhood Markets.

86.     Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Robinhood that was tied to the performance or artificially inflated valuation of Robinhood or received compensation or other payments that were unjust in light of Defendants' bad faith conduct.

87.     Plaintiff, as a shareholder and representative of Robinhood, seek restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

88.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### (Against Defendants For Violation Of Section 10(b) Of The Exchange Act)

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     During the period of wrongdoing, Defendants disseminated or approved false or misleading statements about the Company, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct artificially inflated the price of the Company's common stock.

91.     Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of the Company's stock during the period of wrongdoing.

92.     As a result of Defendants' misconduct, the Company has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and risk management, and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 21, 2022

          **BIELLI & KLAUDER, LLC**

          */s/ Ryan M. Ernst*
          Ryan M. Ernst (No. 4788)
          1204 N. King Street
          Wilmington, DE 19801
          Telephone: (302) 803-4600
          Email: rernst@bk-legal.com

          **GAINEY McKENNA & EGLESTON**
          Thomas J. McKenna
          Gregory M. Egleston
          501 Fifth Avenue, 19th Floor
          New York, NY 10017
          Telephone: (212) 983-1300
          Facsimile: (212) 983-0383
          Email: tjmckenna@gme-law.com
          Email: gegleston@gme-law.com

          *Attorneys for Plaintiff*